JMK:KTF/MEB
F. # 2016R00658

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

CHRISTOPHER DAVIES,

        Defendant.

- - - - - - - - - - - X

18-346M

COMPLAINT AND AFFIDAVIT IN SUPPORT OF ARREST WARRANT

(15 U.S.C. §§ 78j(b) and 78ff)

EASTERN DISTRICT OF NEW YORK, SS:

      RICHARD CINNAMO, being duly sworn, deposes and states that he is a Postal Inspector with the United States Postal Inspection Service, duly appointed according to law and acting as such.

      Upon information and belief, in or about and between November 2014 and August 2016, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant CHRISTOPHER DAVIES, together with others, did knowingly and willfully use and employ one or more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission ("SEC"), Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing one or more devices, schemes and artifices to defraud; (b) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in one or more acts, practices

and courses of business which would and did operate as a fraud and deceit upon one or more investors and potential investors in American Transportation Holdings Inc. ("ATHI"), in connection with the purchase and sale of investments in ATHI, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff)

The source of your deponent's information and the grounds for his belief are as follows:

1. I am a Postal Inspector with the United States Postal Inspection Service ("USPIS") and have been involved in the investigation of numerous cases involving securities and wire fraud. I have been a Postal Inspector with the USPIS for approximately 20 years.

2. I have personally participated in the investigation of securities fraud by the defendant CHRISTOPHER DAVIES. I am familiar with the facts and circumstances of this investigation from, among other things: (a) my personal participation in this investigation, (b) discussions with other law enforcement agents, (c) discussions with victims and witnesses, and (d) bank records and public records, among other sources of evidence.

3. Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I learned from other law enforcement agents. Because this affidavit is being submitted for the limited purpose of establishing probable cause to arrest the defendant CHRISTOPHER DAVIES, I have not set forth each and every fact learned during the course of this investigation. Instead, I have set forth only those facts that I believe are necessary to establish probable

cause for the arrest warrant sought herein. In addition, where the contents of documents, or the actions, statements and conversations of others are reported herein, they are reported in sum and substance and in part.

## I. Background

### A. Relevant Regulatory Principles and Definitions

4. An "affiliate" of a publicly traded company generally referred to a person, such as an executive officer, director or large shareholder, in a relationship of control with the issuer of securities. Affiliates were required to abide by certain rules in selling stock. Based on my training and experience, a person who owned or controlled 10 percent or more of a company's stock was commonly understood as being an affiliate of the company.

5. Rule 144 of Section 5 of the Securities Act of 1933 (the "Securities Act") set forth certain conditions that a seller had to satisfy in order to sell restricted or control securities (e.g., securities owned by an affiliate). Once the conditions of Rule 144 were satisfied, restricted or control securities could not be sold until the restrictive legend was removed from the certificate. Only a transfer agent could remove the legend, and required the issuing company's consent. This consent typically came in an opinion letter from the issuing company's attorney, commonly referred to as a Rule 144 Legal Opinion.

6. Section 3(a)(10) of the Securities Act was an exemption from Securities Act registration for offers and sales of securities for certain transactions, including the conversion of a debt into stock. Certain conditions had to be satisfied to qualify for an exemption under Section 3(a)(10), including that a court or authorized governmental

entity was required to hold a hearing to approve the fairness of the terms and conditions of the exchange. Thus, with court approval, a company could convert corporate debt into stock under Section 3(a)(10), which was commonly referred to as a Section 3(a)(10) conversion. I know based on my training and experience that Section 3(a)(10) conversions could be employed fraudulently in conjunction with fraudulent debt instruments in order to increase the amount of stock an individual or entity held for little or no money in advance of executing a "pump and dump" scheme.

7. "Microcap" or "penny" stocks referred to stocks of publicly traded U.S. companies which have a low market capitalization. Microcap stocks were often subject to price manipulation because they were thinly traded and subject to less regulatory scrutiny than stocks that traded on notable exchanges. Additionally, large blocks of microcap stock were often controlled by a small group of individuals, which enabled those in the group to control or orchestrate manipulative trading in those stocks.

8. The term "pink sheets" referred both to daily publications compiled by the National Quotation Bureau with bid and ask prices of over-the-counter ("OTC") stocks and OTC trading itself. Based on my training and experience, I am aware that, unlike companies on a stock exchange, companies quoted on the pink sheets system do not need to meet certain minimum capital requirements or file with the SEC.

9. A "pump and dump" scheme was a scheme where a group of individuals who controlled the free trading or allegedly unrestricted shares, also referred to as the "float," of a microcap company fraudulently inflated the share price and/or trading volume of the targeted public company through, inter alia, false and misleading press

releases and paid stock promotions. When the target company's share price reached desirable levels, an individual or individuals controlled by the group sold their free trading shares in an effort to achieve substantial financial gain.

### B. The Relevant Entities and Defendant

10. ATHI, a Nevada corporation, was a publicly traded corporation whose shares traded on the OTC exchange under the ticker symbol ATHI. In public statements from January 2018, ATHI purported to be a holding company in the business of specializing in the creation and production of cloud-based games and applications. Previously, ATHI had changed its name and purported business purpose numerous times over the years. Prior to 2010, ATHI was known as Micro Mammoth Solutions, Inc. and claimed to focus on providing consulting services to small- and medium-sized mortgage brokers and mortgage lenders in Florida. In January 2012, the company changed its name to Atlas Capital Partners, LLC, and purported to specialize in providing growth assistance and capital to small- to medium-sized enterprises. In March 2012, the company became Home Health International Inc., and purported to specialize in home healthcare. In approximately 2013, the company claimed to be in the business of providing transportation services in Florida, and then changed its business to peer-to-peer gambling. In approximately April 2014, the company adopted its current name and purported to specialize in the cloud-based gaming business. ATHI (including its predecessor names) was a microcap stock. In or about and between November 2014 and August 2016, it generally traded between $0.01 and $0.50, although on one day in July 2016, as a result of fraudulent trading and material misrepresentations discussed in more detail below, it traded at up to $12 per share.

11. Since 2008, ATHI employed a stock transfer agent, referred to herein as the "Transfer Agent," that was located in Brooklyn, New York.

12. Ambrose & Keith Fund Management, also known as Ambrose & Keith, Inc. ("A&K, Inc.") was a Florida corporation. A&K, Inc. was previously known as Chadwick & Collins. Since at least December 2014, public filings listed the defendant CHRISTOPHER DAVIES as the Chief Executive Officer ("CEO") of A&K, Inc.

13. Ambrose & Keith Ltd. ("A&K Ltd.") was a subsidiary of A&K, Inc. In or about March 2018, the defendant CHRISTOPHER DAVIES' LinkedIn profile stated that DAVIES was the "managing partner" of A&K Ltd.

14. AMCT, Inc. ("AMCT") was a shell company incorporated in Florida that was controlled by the defendant CHRISTOPHER DAVIES.

15. A Nevada limited liability company referred to herein as "Financing Company-1" offered financing to microcap issuers by using the registration exemption set forth in Section 3(a)(10) of the Securities Act. In 2016, Financing Company-1 consented to a settled administrative and cease-and-desist order from the SEC based on violations of Section 5 of the Securities Act for conduct similar to the conduct described in paragraphs 36 through 40 below.

16. The defendant CHRISTOPHER DAVIES was a United States citizen who resided in Deerfield Beach, Florida. DAVIES was formerly a member of the Illinois bar, but his law license was suspended in 2015 after he was arrested and charged with felony possession of a controlled substance in Florida. DAVIES was identified in public documents as the CEO of ATHI in approximately 2010 and 2011 and, as described further

below, secretly maintained control of ATHI in subsequent years through a series of nominee[1] CEOs. DAVIES was the majority shareholder of ATHI, holding 10,075,000 shares of ATHI stock as of June 30, 2010, which comprised approximately 60 percent of ATHI's issued common stock.

## II. The Securities Fraud Scheme

### A. Overview

17. In or about and between November 2014 and August 2016, the defendant CHRISTOPHER DAVIES, together with others, engaged in a scheme to defraud investors of ATHI by, inter alia, making material misrepresentations and omissions to investors and potential investors of ATHI and fraudulently employing Section 3(a)(10) conversions to increase the amount of unrestricted stock controlled by DAVIES through shell companies and/or nominees controlled by him.

18. Specifically, from 2012 onwards, the defendant CHRISTOPHER DAVIES concealed his control of ATHI from the investing public through a series of nominee CEOs and false SEC filings. DAVIES, while concealing his control of ATHI, accumulated a large number of ATHI shares at no or low cost through debt-to-stock conversions that circumvented the rules of the Securities Act. DAVIES then issued, or caused to be issued, false press releases claiming that ATHI had entered into business deals

---

[1] The term "nominee" referred to an individual who purported to be in a position of control over the company, but whose position was used to conceal from the public that another individual actually controlled the company.

with other companies and had developed new technology in order to raise the price of ATHI's stock for the purposes of executing a pump and dump scheme.

19. After the defendant CHRISTOPHER DAVIES fraudulently inflated the share prices and trading volumes of ATHI, and deceived potential investors into believing that market forces alone set ATHI's artificially inflated share prices and trading volume, one or more co-conspirators of DAVIES sold ATHI stocks at a profit.

B. **The Nominee CEOs**

20. ATHI's SEC filings in or about and between 2010 and 2011 identified the defendant CHRISTOPHER DAVIES as ATHI's CEO and majority shareholder. From approximately 2012 through 2017, ATHI's SEC filings no longer identified DAVIES as the CEO of ATHI, but DAVIES nevertheless continued to control the company. DAVIES' continued control of ATHI was evidenced by, among other things: (a) that until at least late 2015, DAVIES had sole control over ATHI's bank account, which DAVIES opened in 2008 under the name of Atlas Capital Partners; (b) DAVIES communicated on behalf of ATHI with ATHI's attorney, Transfer Agent and accountant until at least late 2016; and (c) DAVIES posted or directed the posting of all ATHI-related news and filings on the OTC Markets website. DAVIES also maintained this secret control of ATHI through a series of nominee CEOS whom he controlled.

21. The first such nominee CEO is referred to herein as "CEO-1." CEO-1 first appeared as the signatory to ATHI's quarterly report filed with the SEC for the period ending December 31, 2011. In addition, an ATHI board resolution, which was provided to ATHI's Transfer Agent, purported to replace the defendant CHRISTOPHER DAVIES with

CEO-1 as ATHI's president, secretary and treasurer. The board resolution misspelled CEO-1's name, and appears to be mistakenly dated February 20, 2014 (rather than 2012). Based on my training, experience, and investigation in this case, I believe that DAVIES created this board resolution years after the fact while attempting to update ATHI's files with the Transfer Agent, and that he made a typographical error in backdating the document to 2014 instead of 2012, as well as in misspelling CEO-1's name.

22. A second nominee CEO (identified herein as "CEO-2") appeared in ATHI's March 2012 Disclosure Statement, which was posted on the OTC Markets website on May 30, 2012. ATHI's March 2012 Disclosure Statement stated, among other things, that CEO-2 was the sole officer, director and control person of ATHI as of March 31, 2012.

23. I conducted an interview of CEO-2 in August 2016. During that interview, CEO-2 stated that she has never heard of ATHI, and has never been associated with ATHI in any capacity. CEO-2 further stated that she has a background in nursing, and recalled meeting the defendant CHRISTOPHER DAVIES over lunch in approximately 2012 when DAVIES expressed interest in purchasing a home healthcare company with which CEO-2 was associated. During the interview, I showed CEO-2 a number of ATHI documents that appeared to have her signature on them. As discussed in more detail below, CEO-2 informed me that she did not sign those documents and that her purported signatures were forgeries. Based on the statements made by CEO-2 during the interview, I believe that the statements made about CEO-2 in ATHI's March 2012 Disclosure Statement were false.

24. ATHI's June 2014 and October 2014 Disclosure Statements identified a third nominee CEO ("CEO-3"). Both the June 2014 and October 2014 Disclosure

Statements reported that the sole officer, director and control person of ATHI was CEO-3, and both were purportedly signed by CEO-3. In an April 2016 interview with officials from the SEC, CEO-3 stated that the defendant CHRISTOPHER DAVIES was a friend of her mother's. CEO-3 further stated she was merely a placeholder CEO, and that DAVIES was actually running ATHI. She stated that DAVIES handled ATHI's finances, business operations and business development, as well as matters concerning ATHI's stock. CEO-3 stated that she did very little during her tenure as ATHI's CEO other than sign documents sent to her by DAVIES. Accordingly, based on this interview, I believe that the representations made about CEO-3's control of ATHI in the June 2014 and October 2014 Disclosure Statements for ATHI were false.

25. A person who is referred to herein as CEO-4 served as ATHI's CEO from in or about November 2014 through approximately late January 2015. Unlike his predecessor nominee CEOs, CEO-4 had a professional background in online gaming, and was told by the defendant CHRISTOPHER DAVIES that ATHI was a vehicle through which DAVIES would raise capital for several video game products that CEO-4 intended to bring to market. CEO-4 resigned as ATHI's CEO in or about late January 2015 after discovering, as discussed further below, that DAVIES had forged his signature on certain corporate documents submitted to ATHI's Transfer Agent.

26. A purported March 13, 2015 ATHI board resolution appointed a fifth nominee CEO ("CEO-5") as ATHI's sole officer and director. The defendant CHRISTOPHER DAVIES retained control of ATHI during CEO-5's tenure, as he did during the tenure of the prior nominee CEOs. CEO-5's tenure only lasted a few months. In a June

16, 2015 email, DAVIES informed CEO-5 that "your resignation will take effect as of May 5, 2015."

27. In approximately May 2015, a sixth nominee CEO ("CEO-6") became the CEO of ATHI after CEO-6's brother introduced him to the defendant CHRISTOPHER DAVIES. When I interviewed CEO-6 in August 2016, he stated that he was the only employee of ATHI and that ATHI had no income, bank account or assets. CEO-6 further stated that DAVIES would send him corporate documents to sign via email and that he would sign them without carefully reviewing them because he trusted DAVIES. CEO-6 also stated that DAVIES would email him press releases related to ATHI and that he would upload them to the OTC Markets website. On or about August 15, 2017, CEO-6 resigned as CEO of ATHI.

    **C.**     **Davies Causes Pump of ATHI with a False November 2014 Press Release**

28. At least as early as November 2014, the defendant CHRISTOPHER DAVIES began issuing false press releases with the goal of artificially inflating the price of ATHI's stock. During this time, DAVIES concealed his control of ATHI from the investing public.

29. On or about November 11, 2014, the defendant CHRISTOPHER DAVIES caused ATHI to issue a press release announcing that it had entered into an agreement with what is referred to herein as Gaming Company 1 to develop three new digital peer-to-peer betting platforms. A principal of Gaming Company 1, however, confirmed to me that Gaming Company 1 has never entered into any contracts with ATHI, and it has not

developed any applications or software for ATHI. Accordingly, I believe that the November 11, 2014 press release contained false statements.

30. The day after this false press release, ATHI's closing stock price surged from $0.10 to $0.50 per share, and then dropped back to $0.13 per share the following day.

D. **Davies' January 2015 Attempt to Illegally Convert Debt to ATHI Stock**

31. In approximately January 2015, the defendant CHRISTOPHER DAVIES attempted to illegally convert a $124,500 promissory note into 15 million shares of ATHI.

32. In furtherance of that scheme, on or about January 26, 2015, the defendant CHRISTOPHER DAVIES sent an email to ATHI's Transfer Agent regarding the conversion of a $124,500 promissory note into 15 million shares of ATHI. DAVIES attached to the email a favorable Rule 144 legal opinion from DAVIES' attorney, along with ATHI board resolutions purportedly signed by CEO-2 and CEO-4. The board resolutions purported to authorize the conversion of the debt to the stock.

33. CEO-2's and CEO-4's signatures on the respective board resolutions were, in fact, forgeries, as confirmed during my subsequent interviews of CEO-2 and CEO-4. On or about January 28, 2015, CEO-4 reported to ATHI's Transfer Agent that his signature on one of ATHI's board resolutions was forged.

34. On or about February 3, 2015, in response to inquiries by the Transfer Agent about the forgeries, the defendant CHRISTOPHER DAVIES sent an email to the Transfer Agent and DAVIES' attorney, attaching various purported ATHI board resolutions signed by CEO-4 and others in support of the debt conversion. A Yahoo email address that

contained the first and last name of CEO-4 (the "Yahoo Email") was copied on DAVIES' email in order to create the appearance that DAVIES had copied CEO-4 on his email. However, CEO-4 stated to me during a June 2016 interview that he had never used the Yahoo Email, and subpoena responses from Yahoo and AT&T revealed that the Yahoo Email was created at an IP address that was assigned to DAVIES.

35. On or about February 10, 2015, the Transfer Agent's attorney informed the defendant CHRISTOPHER DAVIES' attorney that the Transfer Agent would not proceed with the stock transfer, since CEO-4 had disclaimed the validity of various ATHI board resolutions. On or about February 11, 2015, DAVIES' attorney rescinded the favorable Rule 144 legal opinion that DAVIES sent to the Transfer Agent on or about January 26, 2015.

### E. Davies' Fraudulent Conversion of Debt to ATHI Stock

36. One month after his failed attempt to convert a $124,500 promissory note into 15 million shares of ATHI on the basis of forged documents, the defendant CHRISTOPHER DAVIES successfully converted alleged debt into ATHI stock.

37. On or about March 10, 2015, the defendant CHRISTOPHER DAVIES signed a Claim Purchase Agreement on behalf of A&K Ltd. executing the sale of $37,546.74 in ATHI debt to Financing Company-1 pursuant to a Section 3(a)(10) conversion. The Claim Purchase Agreement referenced a promissory note, purportedly signed by CEO-2 on behalf of Atlas Capital Partners, LLC ("Atlas"), which was one of the names ATHI previously went by. The promissory note purported to memorialize a loan to Atlas from

A&K Ltd. CEO-2 confirmed during her August 2016 interview that her signature on the promissory note was a forgery, and that she was never knowingly affiliated with Atlas.

38. Also on or about March 10, 2015, the defendant CHRISTOPHER DAVIES facilitated the sale of three other ATHI debts—$5,385.60 owed to the Transfer Agent, $4,000 owed to a consulting company, and $16,000 owed to DAVIES' attorney—to Financing Company-1. These four debts totaled $62,932.44.

39. On or about March 12, 2015, Financing Company-1 and ATHI executed a settlement agreement in which Financing Company-1 agreed to purchase the liabilities of ATHI set forth above for $62,932.44, which represented 100% of their value. Based on my training and experience, I believe that it is highly unusual (and, in typical circumstances, economically irrational) for a company to buy debt at 100% of its value.

40. On or about March 16, 2015, ATHI's Transfer Agent began recording a series of ATHI stock issuances in the name of Financing Company-1, beginning with an 830,000 share conversion. From approximately March 16, 2015 to September 18, 2015, the Transfer Agent recorded more than 200 million shares of ATHI as being owned by Financing Company-1.

F. **ATHI's Stock Price Skyrocketed Following False Press Releases**

41. In or about June 2016, the defendant CHRISTOPHER DAVIES issued, and cause to be issued, a series of false press releases in a successful effort to artificially inflate ATHI's stock price. As detailed below, these press releases related to ATHI's purchase by the National Indoor Football League ("NIFL"), and claims about technology that ATHI purportedly brought to the deal. CEO-6 was ATHI's CEO at the time of the press

release issuances, and DAVIES directed all of CEO-6's actions with respect to ATHI at this time.  CEO-6 stated to me during an interview in July 2016 that DAVIES emailed him press releases related to ATHI and he (CEO-6) would upload them to the OTC Markets website.

42. On or about June 29, 2016, the NIFL issued a press release announcing that it had purchased ATHI.  CEO-6 later stated to me that he was unaware of the NIFL purchase until he read a draft of the press release provided to him by the defendant CHRISTOPHER DAVIES, because the sale had been orchestrated by DAVIES without CEO-6's knowledge or input.  The press release claimed that the NIFL's first team in Dallas, Texas would "leverage technology that ATHI developed for gaming, media entertainment and fan participation to attract fans, investors and media partners nationwide." Based on information learned in the course of the investigation, I believe that ATHI and NIFL had no such technology.

43. A July 14, 2016 press release issued by ATHI made the additional claim that "ATHI has generated an app that is capable of providing an interactive gaming experience for NIFL fans."  Likewise, a July 18, 2016 press release issued by ATHI quoted CEO-6 as saying, "Our partnership with the NIFL will allow us to leverage our mobile platforms we have been developing and enable us to bring significant interest in what ATHI has to offer."  When, during a subsequent interview with CEO-6, I asked him if any mobile app had been developed by or for ATHI, CEO-6 responded that, as far as he knew, there was no mobile app.  Thus, I believe that the representations made in ATHI's July 14, 2016 and July 18, 2016 press releases were false.

44. The false press releases issued by ATHI had their intended effect. On July 15, 2016, during a single trading day, the price of ATHI shares rose to from $1.105 to $12.00 per share.

45. I have interviewed multiple victim investors who purchased ATHI's stock in July 2016, including at least one investor who purchased stock on or about July 15, 2016. Several of these victim investors indicated that reports of ATHI's purported gaming technology—which contained false and misleading information that the defendant CHRISTOPHER DAVIES communicated to the investing public through ATHI's press releases—was their impetus for buying ATHI stock. Other victim investors indicated that the surge in ATHI's stock price in July 2016 motivated their purchases of ATHI stock.

46. In response to the stock's promotion, on or about July 15, 2016, the OTC Markets placed a "Caveat Emptor" on ATHI's stock. The "Caveat Emptor" designation informed investors to exercise additional caution before making an investment decision in a particular security due to heavy promotional activity.

47. A July 25, 2016 ATHI press release addressed its Caveat Emptor status, stating, "ATHI had no idea the amount of interest it would attract by announcing it had been purchased by the [NIFL] and the NIFL's plan to televise the upcoming inaugural football season in 2018." It continued with a quote from CEO-6: "The stock price increased dramatically up to $12.00 per share . . . We do not and have not promoted our company's stock, so we had no idea why the stock began to increase so much in such a short period of time."

48. On or about July 26, 2016, the SEC temporarily suspended trading in ATHI because of the stock's unusual market activity during a suspicious promotional campaign, and concerns about the accuracy of the company's recent press releases.

49. While at its peak share price of $12.00, ATHI had a market capitalization of approximately $3 billion. In addition, as a result of the defendant CHRISTOPHER DAVIES' conduct, together with others, in connection with the 2016 pump and dump scheme described above, ATHI investors suffered actual losses of approximately $120,000.

### G. Davies' June 2016 Attempt to Convert AMCT Debt to Stock

50. In addition to causing the issuance of false press releases designed to inflate ATHI's stock price, during June and July of 2016, the defendant CHRISTOPHER DAVIES also took other steps in an effort to use ATHI's stock to defraud the investing public. As further explained below, in June and July 2016, the defendant attempted to convert $67,531.50 in purported debt owed by ATHI to a related entity controlled by DAVIES into 6.7 million shares of ATHI's stock. Based upon the parties to this transaction, the series of events leading up to it, and my knowledge of this case, I believe that the debt was simply a sham transaction designed to give DAVIES additional free trading ATHI shares at no cost.

51. On or about June 11, 2015, ATHI had purportedly executed a Share Purchase Agreement and Assignment and Assumption of Debt ("Share Purchase Agreement") with AMCT so that AMCT became a wholly owned subsidiary of ATHI. As set forth above, AMCT was controlled by the defendant CHRISTOPHER DAVIES. The

Share Purchase Agreement was purportedly executed by AMCT's CEO (the "AMCT CEO"), CEO-6 of ATHI, and DAVIES as Managing Partner of Ambrose & Keith Ltd., which was listed as the "Creditor" of the transaction.

52. In an August 2016 interview, the AMCT CEO stated to me that he did not sign the Share Purchase Agreement. The AMCT CEO further stated that, years ago, he had opened up a bank account in the name of AMCT at the behest of his sister, who was a friend of the defendant CHRISTOPHER DAVIES, but that he had not engaged in any transactions on behalf of AMCT since opening that bank account.

53. The debt described in the Share Purchase Agreement was approximately $607,503.50. Records obtained from the attorney of ATHI's Transfer Agent revealed that the "debt" was actually comprised of four 2012 cash transfers from a predecessor of A&K Ltd. to AMCT. The cash transfers were as follows: $67,531.50 on or about February 7, 2012; $180,222 on or about February 13, 2012; $239,750 on or about February 22, 2012; and $120,000 on or about March 19, 2012.

54. On or about July 11, 2015, A&K Ltd. and A&K, Inc. entered into an agreement in which A&K Ltd. assigned the right to exercise the conversion clause in the February 7, 2012 $67,531.50 debenture to A&K, Inc. The defendant CHRISTOPHER DAVIES signed on behalf of both A&K entities.

55. Approximately one year later, on or about July 11, 2016, the defendant CHRISTOPHER DAVIES, on A&K Investment Group letterhead, sent a letter to ATHI, care of CEO-6, in which DAVIES expressed his intention to convert the $67,531.50 debenture into 6.7 million shares of ATHI stock.

56.     Approximately four days later, on or about July 15, 2016, CEO-6 signed an ATHI board resolution as "Sole Director" of ATHI authorizing the conversion of the $67,531.50 debenture into 6.7 million shares of ATHI stock.  CEO-6 also signed a letter that day certifying to the Transfer Agent that ATHI had converted the $67,531.50 debt into 6.7 million ATHI shares.  The letter claimed that A&K, Inc. never had any direct or indirect control of ATHI.  Based on information learned during the investigation, I believe that statement was false because the defendant CHRISTOPHER DAVIES controlled both entities.  CEO-6 also requested that the Transfer Agent transfer the shares to A&K, Inc.

57.     On or about July 18, 2016, an attorney issued a Rule 144 opinion letter opining that the 6.7 million shares could be issued to A&K, Inc. without a restricted legend.

58.     CEO-6 resigned on or about August 16, 2016.  Following an inquiry from the Transfer Agent, on or about August 22, 2016, at the request of the defendant CHRISTOPHER DAVIES, CEO-6 signed another letter certifying to the Transfer Agent that ATHI converted the $67,531.50 debt into 6.7 million ATHI shares.  The letter was backdated to August 10, 2016 and purported to be from CEO-6 in his capacity as CEO, even though he was no longer ATHI's CEO at the time that he signed the letter.  Based on my training and experience, I believe that this debt conversion defrauded the investing public by giving DAVIES control over an additional 6.7 million ATHI shares at no cost and without disclosing to the public that DAVIES controlled such shares.

WHEREFORE, your deponent respectfully requests that the defendant CHRISTOPHER DAVIES be dealt with according to law.

S/ RICHARD CINNAMO

_____

RICHARD CINNAMO
Postal Inspector,
United States Postal Inspection Service

Sworn to before me this
__18__ day of April, 2018

     S/ CHERYL L. POLLAK
_____
THE HONORABLE CHERYL L. POLLAK
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK